**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **TITAN LOGISTICS GROUP LLC, ET AL.,** | : | **Case No. 3:26-cv-01300** |
| | : | |
| | : | |
| *Plaintiffs,* | : | **Judge Jeffrey J. Helmick** |
| | : | |
| **v.** | : | |
| | : | **Magistrate Judge Darrell A. Clay** |
| **BETH TISCHLER, ET AL.,** | : | |
| | : | |
| *Defendants.* | : | |

---

**INTERVENOR STATE OF OHIO'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
INJUNCTION**

---

Respectfully submitted,

D. ANDREW WILSON
Ohio Attorney General

/s/ *Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069762)*
*_Lead Counsel_
MICHAEL A. WALTON (0092201)
ANN YACKSHAW (0090623)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215-3428
Tel: 614-466-1853 | Fax: 855-326-1696
Julie.Pfeiffer@OhioAGO.gov
Michael.Walton@OhioAGO.gov
Ann.Yackshaw@OhioAGO.gov

*Counsel for the State of Ohio*

### INTRODUCTION & BACKGROUND

S.B. 56 closed a loophole that Congress created when it decriminalized hemp, which, like marihuana, is derived from cannabis, in the 2018 Farm Bill. Under the 2018 Farm Bill, hemp products must not exceed a 0.3% concentration of delta-9 tetrahydrocannabinol, commonly known as THC, to be considered "hemp." 7 U.S.C. 1639o(1). Before S.B. 56, Ohio law mirrored this definition.  Quickly, the hemp industry found it could use delta-8 THC to induce the same psychoactive effects as marihuana while remaining under the 0.3% delta-9 THC threshold. As a result, synthetically manufactured hemp products as potent as regulated marihuana—but still technically unregulated "hemp"— flooded the Ohio market. Having gone unregulated in Ohio for years, the public was increasingly exposed to, and had injuries resulting from, intoxicating hemp. Until Ohio enacted S.B. 56, hemp products existed in a "wild west" free from state oversight.

Over this same period, Ohio began closely regulating the medical and adult use of cannabis products. Now, retail sales of cannabis products all require licenses issued by the Division of Cannabis Control. Ohio Rev. Code § 3796.02. The Division offers a limited number of licenses for cannabis dispensaries to incentivize existing licensees to comply with the Division's stringent regulations. Ohio Rev. Code §  3796.05(B)(1) (currently capped at 400). To enable regulation and avoid running afoul of federal law, Ohio requires all licensed dispensaries to have a physical presence in the state.  Licensed dispensaries can be owned by either in-state or out-of-state individuals or entities. *See* Ohio Rev. Code § 3796.10. To ensure seed-to-sale tracking and quality control, all cannabis for products sold in Ohio must be sourced from within the state. Ohio Admin. Code § 3796:6-3-01(C–D), Ohio Rev. Code § 3769.07, 3796.19(A)(1)(a), 3796.20(A)(1)(a).

Federal hemp regulations are set to change on November 12, 2026. Then, federal law will prohibit the sale of intoxicating hemp nationwide—the same way it does marihuana. Anticipating this change, S.B. 56 closed the hemp loophole in Ohio. It reclassified all synthetically produced hemp

1

products and products above 0.3% *total* THC (on a dry-weight basis) as marihuana to be regulated by the Division of Cannabis Control. *See* Ohio Rev. Code § 928.01(C); 3719.01(M). As passed by the General Assembly, the bill included a carveout for certain THC-infused beverages, which the bill called "drinkable cannabinoid products." S.B. 56 would have allowed such products to be sold until the end of 2026 outside the marihuana program's stringent regulations. But Governor DeWine line-item vetoed the carveout for drinkable cannabinoid products, so most THC-infused beverages were reclassified from unregulated hemp to regulated marihuana beginning on March 20, 2026.

Faced with that sea-change, Plaintiffs did nothing. Given three months between S.B. 56's passage and its effective date, Plaintiffs sat on their rights and waited. They continued to sell their soon-to-be-illegal products but made no effort to challenge the legality of S.B. 56 or the Governor's line-item veto. They did not seek licenses from the Division of Cannabis Control to participate in Ohio's marihuana program or prepare to seek such licenses. Instead, nearly 3 months after S.B. 56 took effect, Plaintiffs, a group of both in-state and out-of-state intoxicating hemp manufacturers and distributers, filed their complaint seeking emergency relief, alleging that S.B. 56 violates dormant Commerce Clause and preemption principles under the U.S. Constitution and that Governor DeWine exceeded his line-item veto power in violation of the Ohio Constitution. *See generally* Compl., ECF No. 1. Contemporaneously with their complaint, Plaintiffs filed a motion for temporary restraining order and injunction. *See generally* Mot. for TRO, ECF No. 2.  But, as explained below, Plaintiffs cannot carry their heavy burden to establish a right to such extraordinary relief.

I.     **LAW AND ARGUMENT**

   A.  **Standard of Review**

"The purpose of both a preliminary injunction and a temporary restraining order is to *preserve the status quo* until a trial on the merits or some other reasoned resolution of the dispute takes place." (Emphasis added.) *Boroff v. Wapakoneta City Schs. Bd. of Educ.*, No. 3:26-cv-522, 2026 U.S. Dist. LEXIS

48036, at *4-5 (N.D. Ohio Mar. 9, 2026) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). S.B. 56 has been in effect since March 20, 2026, nearly three months before Plaintiffs filed their complaint and motion. S.B. 56 *is* the status quo and should remain undisturbed.

The standard that applies to preliminary injunctions is also applied to temporary restraining orders. *Id.* at *5 (citing *Northeast Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). "To grant either form of injunctive relief, a court must consider: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent a stay; (3) whether granting the stay would cause substantial harm to others; and (4) whether the public interest would be served by granting the stay.'" *Id.* (quoting *Blackwell*, 467 F.3d at 1009). Plaintiffs bear a heavy burden to establish entitlement to the extraordinary remedy of a temporary restraining order by clear and convincing evidence. *Just Funky, LLC v. Boom Trendz, LLC*, No. 5:21-cv-1127, 2021 U.S. Dist. LEXIS 118483, at *5 (N.D. Ohio June 25, 2021) (citing *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). Although no single factor is dispositive, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

**B. Laches bars Plaintiffs' request for any temporary or preliminary injunctive relief.**

In the Sixth Circuit, "laches is understood to be 'a negligent and unintentional failure to protect one's rights.' 'A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'" (Citations omitted.) *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007). A plaintiff's "delay in bringing its claims *severely undermines its request for emergency injunctive relief.*" (Emphasis added.) *Total Quality Logistics, LLC v. III's Hotshot, Inc.*, No. 1:17cv352, 2017 U.S. Dist. LEXIS 197990 at *10 (S.D. Ohio Dec. 1, 2017). Where a plaintiff fails "to act with extreme diligence and promptness . . . the doctrine of laches bars" a motion

3

for temporary restraining order and preliminary injunction. *Lyons v. City of Columbus*, No. 2:20-cv-3070, 2020 U.S. Dist. LEXIS 108230 at \*17 (S.D. Ohio June 19, 2020). *See also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.") (citation omitted); *Perry v. Judd*, 471 Fed. Appx. 219, 228 (4th Cir. 2012) ("the district court was correct in concluding that the defense of laches bars the requested relief on the instant motion" for preliminary injunction); *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("While laches may not be sufficient to bar a permanent injunction it may well be a bar to preliminary relief.") (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)); *Keyes v. Eureka Consolidated Mining Co.*, 158 U.S. 150, 153 (1978) (unexplained delay "disentitles" plaintiffs "to a preliminary injunction").

In this case, laches bars Plaintiffs' request for temporary and preliminary injunctive relief. First, Plaintiffs exhibited an undeniable lack of diligence in seeking such relief. Governor DeWine signed S.B. 56 on December 19, 2025, with the line-item veto Plaintiffs challenge herein, and the non-appropriation provisions of the law went into effect on March 20, 2026. *See* Ohio Const. art. II, § 1c, d. Relators inexcusably waited one hundred and sixty-seven (167) days from Governor DeWine's approval/line-item veto, and seventy-six (76) days from the law's effective date, until June 4, 2026, to seek "emergency" relief in this Court after seeking the same or similar relief in several other courts. Plaintiffs offer no reason or excuse for this delay, and indeed, the only excuse they could offer is that the full relief they sought was not provided by such other courts.

Second, the Defendants, particularly the State, as well as the public are prejudiced by the Plaintiffs' delay in seeking relief. The Division of Cannabis Control and Division of Liquor Control would suffer material prejudice if this Court were to rule in Plaintiffs' favor and grant a temporary restraining order. The Divisions are in the process of implementing S.B. 56 and such implementation

4

would be halted by the temporary and preliminary relief Plaintiffs request delaying full implementation of the bill following the Court's final judgment rejecting Plaintiffs' challenges on their merits. *See* 7 U.S.C. § 1639p(a)(3)(A) ("Nothing in this subsection * * * preempts or limits any law of a State * * * that - (1) regulates the production of hemp; and (ii) is more stringent than this subchapter."). The bill was designed to protect the public by requiring the rigorous testing and labeling of cannabinoid products sold in Ohio, and delaying implementation of those requirements can only harm the public. Even temporarily enjoining S.B. 56 would again allow children to buy intoxicating hemp products that are fundamentally no different than marihuana.

### C.  This Court should abstain pursuant to *Colorado River.*

Although laches bars Plaintiffs' motion, this Court need not reach the merits of Plaintiffs' motion for temporary restraining order and preliminary injunction for an additional reason – abstention. The United States Supreme Court held that federal courts may abstain from hearing a case solely because there is similar litigation pending in state court based upon wise judicial administration and the general principle against duplicative litigation. Moreover, although styled as federal constitutional claims—under the Commerce and Supremacy Clauses—resolution of those claims would require this Court to rule on unsettled questions of Ohio law, *i.e.*, the construction and application of Ohio S.B. 56, the law that is the subject of Plaintiffs' challenges. Under such circumstances, the Supreme Court has advised federal courts to abstain.

In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the Supreme Court held that "considerations of 'wise judicial administration, giving regard to conservation of judicial resources,'" created a narrow exception to the "virtual unflogging obligation of the federal courts to exercise the jurisdiction given them." 424 U.S. at 817. "A necessary requirement for application of this *Colorado River* doctrine, however, is the presence of a *parallel*, state proceeding." *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28. 31 (6th Cir. 1984) (emphasis sic.). "'Exact parallelism'

is not required; 'it is enough if the two proceedings are substantially similar.'" *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998) (citation omitted). *See also Healthcare Co. v. Upward Mobility, Inc.*, 784 Fed. Appx. 390, 394 (6th Cir. 2019) ("Parallelism does not require identical causes of action in the state and federal lawsuits."). "[W]here the federal claims [are] 'predicated on the same allegations as to the same material facts . . . the actions must be considered 'parallel' for the purposes of the *Colorado River* abstention doctrine.'" *Healthcare Co.*, 784 Fed. Appx. at 394 (quoting *Romine*, 160 F.3d at 340). Nor must the parties in the state court proceedings be identical to those in the federal case. *Heitmanis v. Austin*, 899 F.2d 521, 528 (6th Cir. 1990).

Plaintiffs in this case—at least some of them, through the same counsel—have instituted several state lawsuits making essentially the same challenges they do here.  See, *e.g., Fifty West Brewing Co., L.L.C. v. Canepa*, 2026-Ohio-972; *Saucy Seltzer v. DeWine*, No. 26CV002464 (Franklin C.P. March 20, 2026) (denying TRO), *voluntarily dismissed* (Apr. 6, 2026); *North Fork Distrib.. I. LLC v. Wensinger*, No. 26CV312 (Sandusky C.P. May 14, 2026) (granting preliminary injunction), *appeal pending*, No. S-26-24 (6th Dist.). Given the existence of a parallel state proceeding, the Court must determine whether abstention under *Colorado River* is appropriate after considering the following factors:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; and (4) the order in which jurisdiction was obtained; * * * (5) whether the source of governing law is state or federal, (6) the adequacy of the state court action to protect the federal plaintiff's rights, (7) the relative progress of the state and federal proceedings, and (8) the presence or absence of concurrent jurisdiction. These factors, however, do not comprise a mechanical checklist. Rather, they require "a careful balancing of the important factors as they apply in a given case" depending on the particular facts at hand.

*Romine*, 160 F.3d at 340-41 (citations omitted).

In this case, this Court and the Sandusky County Court of Common Pleas have concurrent jurisdiction over Plaintiffs' claims. Indeed, the Sandusky court acquired jurisdiction when that action was filed on March 24, 2026, approximately two and one-half months before this case was filed. The

6

Sandusky County court has already issued a preliminary injunction, and litigation is proceeding. Allowing the state court to proceed to final judgment will avoid piecemeal litigation and the possibility of conflicting adjudications. And Plaintiffs cannot legitimately argue that the state court cannot adequately protect Plaintiffs' interest as it granted, at least in part, the preliminary relief they requested. Neither forum is more or less convenient to any of the parties. The factors, therefore, favor abstention under the *Colorado River* doctrine.

### D.  Plaintiffs are not likely to succeed on the merits of any of their claims.

#### 1.  Implied Conflict Preemption (Count II)

Plaintiffs are not likely to succeed on the merits of their implied conflict preemption claim[1] because the 2018 Farm Bill does not preempt Ohio from using a different definition of "hemp" than the federal definition.[2] Under the Supremacy Clause, if a state law conflicts with federal law, then the state law must give way. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). But courts "apply the Supremacy Clause with 'the basic assumption that Congress did not intend to displace state law.'" *N. Va. Hemp & Agric. LLC, v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025) (quoting *S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 589-90 (4th Cir. 2002)). This means that federal statutes are presumed not to preempt state laws. *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1995). And this presumption is at its highest when Congress passes a law in an area traditionally occupied by the states, such as the

---

[1] Although not alleged in their complaint, Plaintiffs conclude their preemption section of their motion for temporary restraining order by saying that S.B. 56 is "preempted under * * * express * * * preemption principles." Mot. for TRO, ECF No. 2, PageID # 459. A fundamental principle of federal practice is that a party seeking injunctive relief cannot rely on arguments not raised in the complaint. *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010). Accordingly, this Court should disregard Plaintiffs' sole mention that S.B. 56 violates express preemption too as that argument was not included in their Complaint. *See generally* Compl., ECF No. 1. Despite this deficiency, Plaintiffs would not be likely to succeed on any such claim for the same reasons that their conflict preemption claim fails, which is that the 2018 Farm Bill expressly permits Ohio's change to the definition of "hemp," as included in S.B. 56.

[2] Notably, in the 2025 Farm Bill, which was passed by Congress prior to S.B. 56, the federal definition of "hemp" will mirror Ohio's definition. *See* Pub.L. No. 119-37, 139 Stat. at 558-559. Thus, come November 12, 2026, Plaintiff's products will be illegal under federal law.

protection of the health and safety of their citizens. *Id.* at 475, 485. Preemption claims can be placed into one of three categories – express, field, or conflict. *See KalshiEX LLC v. Schuler*, No. 26-3196, 2026 U.S. App. LEXIS 12260, at \*10 (6th Cir. Apr. 24, 2026). In this case, Plaintiffs allege that S.B. 56 violates conflict preemption principles.

Under conflict preemption, "federal law can impliedly preempt state law if compliance with both sets of laws 'is a physical impossibility' or if the state law 'stands as an obstacle' to the federal law's full purposes." *KalshiEX*, 2026 U.S. App. LEXIS 12260 at \* 10. Plaintiffs focus on the latter. Compl., ECF No. 1, PageID # 38, ¶ 101. The same general preemption rules and presumptions discussed, e.g., the presumption is no preemption. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008); *HW Premium CBD, LLC v. Reynolds*, 742 F.Supp. 3d 885, 898 (S.D. Iowa 2024). Thus, "[t]he power to regulate consumer products, such as Plaintiffs' hemp products, to promote public health and safety falls neatly within a state's traditional police powers." *Id.* (citing *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023). Finally, "[a] court should not find conflict preemption 'unless that was the clear and manifest purpose of Congress.'" *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 546 (7th Cir. 2020) (quoting *Arizona v. United States*, 567 U.S. 387, 400 (2012)).

Plaintiffs' conflict preemption claim is hardly the first of its kind in federal court, which has been consistently rejected by both district and circuit courts throughout the nation. *See DeLorean 88 LLC v. District of Columbia*, 806 F. Supp. 3d 49, 59 (D.D.C. 2025) (compiling cases). Those courts have all analyzed the 2018 Farm Bill's express preemption provision and its anti-preemption provision. *See, e.g.*, *C.Y. Wholesale*, 965 F.3d at 546. The 2018 Farm Bill's express preemption provision provides that "[n]o State \* \* \* shall prohibit the transportation or shipment of hemp or hemp products \* \* \* *through the State*[.]" (Emphasis added.) Pub. L. No. 115-334, § 10114, 132 Stat. at 4914. The Bill's anti-preemption provision states that "[n]othing in this subsection \* \* \* preempts or limits any law of a State \* \* \* that – (1) regulates the production of hemp; and (ii) is more stringent than this subchapter."

8

7 U.S.C. § 1639p(a)(3)(A).

Courts that have interpreted the 2018 Farm Bill preemption clause have read the clause narrowly and have not expanded it to include transportation or shipment *to or from* a particular state. *See, e.g.*, *HW Premium CBD*, 742 F.Supp. 3d at 895-896; *N. Va. Hemp*, 125 F.4th at 493-494; *C.Y. Wholesale* 965 F.3d at 547. *HW Premium CBD* is illustrative. There, companies engaged in Iowa's consumable hemp industry challenged a variety of amendments to Iowa law related to hemp potency limits, warning label requirements, and other changes. 742 F.Supp.3d at 892. As to preemption, the district court found the plaintiffs lacked standing. *Id.* at 895-897. Looking at the 2018 Farm Bill's express preemption clause, the court found, like many other courts, that it only prevented the interstate transportation of hemp through the state. *Id.* at 895-896. Thus, the 2018 Farm Bill did not expressly permit the import, export, or intrastate transportation of hemp. *See id.* But that is the conduct in which the plaintiffs engaged. *Id.* Here, none of the Plaintiffs allege that they ship their federally-defined "hemp" products through the state of Ohio, e.g., from Michigan to Kentucky via I-75. Instead, like the plaintiffs in *HW Premium CBD*, they either import, export, or transport their goods intrastate. *See* Compl., ECF No. 1, PageID # 18-21. Thus, from a starting point, Plaintiffs' conflict preemption claim fails to get off the ground as they misinterpret the 2018 Farm Bill's preemption provision and no further preemption analysis is required. *See Bio Gen LLC v. Sanders*, 142 F.4th 591, 603 (8th Cir. 2025) ("Because the text and structure do not support Bio Gen's conception of Congress's intent for the 2018 Farm Bill, Bio Gen's arguments for conflict preemption are unsupported, and we do not continue our analysis.").

Moreover, by its own language, the 2018 Farm Bill expressly permits states to: (1) change the definition of hemp to be more stringent than federal law; (2) provide stricter regulations of hemp production and sales; or (3) ban hemp altogether. *See Bio Gen*, 142 F.4th at 603 ("Nor does Congress facilitating state legalization of hemp mean * * * that the states must use the federal definition of

9

hemp."). Again, this has been a uniform finding by courts that have examined this, even Plaintiff's seminal case. *See, e.g.*, *N. Va. Hemp*, 125 F.4th at 493-494 (Virginia law was not preempted by 2018 Farm Bill, which essentially altered the definition of "hemp" by regulating hemp based on *total* THC presence, rather than just delta-9 THC); *Bio Gen*, 142 F.4th at 602-603 (Arkansas law that criminalized previously legal hemp products was not preempted by 2018 Farm Bill); *C.Y. Wholesale*, 965 F.3d at 547 (finding that Indiana's law criminalizing "smokable hemp," was not preempted by the 2018 Farm Bill, to the extent it did not criminalize the transportation of hemp through the state); *Loki Brands, LLC v. Platkin*, 2024 U.S. Dist. LEXIS 185237, *22 (D.N.J. Oct. 10, 2024) (although ultimately striking down New Jersey's law, the court found that the state's change to the definition of "hemp" did not violate preemption or dormant Commerce Clause principles alone). And this is the case even for states, such as Ohio, which do not have a USDA-approved hemp plan. *DeLorean 88*, 806 F. Supp. 3d at *21, citing *HW Premium CBD*, 742 F.Supp. 3d at 899.

In short, courts evaluating a state's hemp laws in relation to the 2018 Farm Bill have consistently held that the challenged laws did not violate conflict preemption because the 2018 Farm Bill expressly permitted the states to regulate hemp more stringently than at the federal level. *See N. Va. Hemp*, 125 F.4th at 495 (the 2018 Farm Bill "expressly permit[s] states to regulate the production of hemp more stringently than federal law"); *Bio Gen*, 142 F.4th at 603 (same). Like the plaintiffs that came before, Plaintiffs' conflict preemption claim is grounded by a false statement of law regarding the 2018 Farm Bill– that it created "a national market in hemp." Mot. for TRO, ECF No. 2, PageID # 459; *contra, e.g.*, *Bio Gen*, 142 F.4th at 603 ("[The Farm Bill] does not support Bio Gen's claim that Congress intended to 'federally protect[] hemp' and coercively mandate nationwide legality."); *N. Va. Hemp*, 125 F.4th at 495 (expressly rejecting the plaintiffs' claim that the 2018 Farm Bill created a national market for hemp). This is, again, evident from the express anti-preemption provision which allows states to place more stringent regulations on hemp. *See N. Va. Hemp*, 125 F.4th at 495. At most,

10

the 2018 Farm Bill "created space for states to legalize hemp production if they wished to do so 'by removing the biggest hurdle – federal criminalization.'" *DeLorean 88*, 806 F.Supp. 3d at 61 (quoting *Bio Gen*, 142 F.4th at 603).

Because the 2018 Farm Bill expressly permitted Ohio to change its definitions of "hemp" and "marihuana," S.B. 56 is not in direct conflict with the 2018 Farm Bill's purpose. Nor does S.B. 56 pose an obstacle to the 2018 Farm Bill's purposes. Accordingly, Plaintiffs are not likely to succeed on the merits of their conflict preemption claim.

### 2.  Dormant Commerce Clause

Plaintiffs' dormant Commerce Clause claim is a red herring because there is nothing "dormant" about interstate hemp regulations. Congress has actively regulated hemp, so the Court need not analyze its dormant powers in this space.

The Commerce Clause, of course, gives Congress the power to regulate commerce among the states. U.S. Const. art. I § 8. The so-called dormant Commerce Clause developed as a safeguard to protect Congress's "latent power from encroachment by the several States" when Congress has not exercised these powers. *Merrion v. Jicarilla Apache Indian Tribe*, 455 U.S. 130, 154 (1982). So, when Congress has not acted in a particular area, courts may review State laws under the dormant Commerce Clause to "ensure that States do not disrupt or burden interstate commerce." *Id.* When Congress deploys its Commerce Clause powers, however, and actively regulates a particular area of interstate commerce, "courts are not free to review state [laws] under the dormant Commerce Clause." *Id.* This makes sense. "When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent states from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action." *Id.*; *see also Fednav, Ltd. v. Chester*, 547 F.3d 607, 624 (6th Cir. 2008) ("We would lose our constitutional bearings if we were to hold that the Commerce Clause, in its dormancy, strikes down state regulation

11

that Congress, in *actively exercising* its power under the Clause, expressly contemplated.").

Thus, courts decline to perform a dormant Commerce Clause analysis when Congress has actively regulated in a particular area. For example, the Sixth Circuit Court of Appeals affirmed the dismissal of a dormant Commerce Clause claim challenging Michigan's ballast-water statutes. *Fednav*, 547 F.3d at 610. Congress actively regulated in this area: it enacted the National Invasive Species Act to prevent the introduction of invasive aquatic species like the zebra mussel through ship ballast. *Id.* at 611. But the law had a loophole: certain ships were not subject to the federal law's ballast-water regulations. So, Michigan enacted its own ballast-water statute, which was challenged on preemption and dormant Commerce Clause grounds. *Id.* at 613. The Sixth Circuit affirmed the dismissal of the dormant Commerce Clause claim because "the Commerce Clause has not been dormant here." *Id.* at 624. Congress enacted NISA, which "expressly contemplated, and indeed encouraged, state participation in [invasive-species] prevention measures" like Michigan's ballast-water statute. *Id.*

Similarly, a district court dismissed a dormant Commerce Clause claim when Congress clearly spelled out which types of state transportation laws were and were not preempted. *See Cal. Trucking Ass'n v. Becerra*, 438 F. Supp. 3d 1139, 1147 (S.D. Cal. 2020). There, Congress enacted a transportation law with an express preemption provision that prohibited States from regulating the "price, route, or service of any motor carrier . . . with respect to the transportation of property." *Id.* (quoting 49 U.S.C. 14501(c)(1)). Trucking companies challenged a California statute, which they alleged was preempted by the federal transportation law and in violated the dormant Commerce Clause. The court dismissed the dormant Commerce Clause claim, finding that "Congress affirmatively exercised its Commerce Clause power to regulate interstate trucking, rendering a separate dormant Commerce Clause review of [the challenged state statute's] impact on interstate commerce unnecessary." *Id.* at 1147.

This Court need not analyze Congress's latent powers under the dormant Commerce Clause here because Congress has actively regulated. In addition to setting up a regulatory scheme for

12

industrial hemp production, Congress "expressly contemplated" state regulation in this area. *See Fednav* 624; 7 U.S.C. 1639p. And as in *California Trucking*, Congress set forth exactly which types of hemp laws are not permitted: "[n]o State * * * shall prohibit the transportation or shipment of hemp or hemp products * * * through the State." Pub. L. No. 115-334, § 10114, 132 Stat. at 4914. Because Congress affirmatively exercised its Commerce Clause power to regulate hemp, a separate dormant Commerce Clause review of S.B. 56 is not necessary. This Court need only determine whether Congress expressly preempted S.B. 56, which, as set forth above, it did not.

Even if this Court looks to the merits of Plaintiffs' dormant Commerce Clause claim, it will find that they are not likely to succeed. "[T]he Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also contain[s] a further, negative command, one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject." (Internal quotations omitted.) *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023). Antidiscrimination lies at the center of the dormant commerce clause. *Id.* at 369. Consistent with this principle, the Supreme Court "has said that the Commerce Clause prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" (Internal quotations omitted). *Id.*, quoting *Department of Revenue of Ky. v. Davis*, 553 U. S. 328, 337-338 (2008) (additional citations omitted).

In *Nat'l Pork*, the Court clarified that the dormant commerce clause is concerned with *purposeful discrimination. See id.* at 371. Prior to *Nat'l Pork*, the Supreme Court instructed courts to apply the test formulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Under the *Pike* test, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142 (citing *Huron Cement Co. v. Detroit*,

362 U.S. 440, 443 (1960)). But the Court has limited the rationale in *Pike*, noting that *Pike* and its progeny "turned in whole or in part on the discriminatory character of the challenged state regulations." *General Motors Corp. v. Tracy*, 519 U. S. 278, 298, fn. 12 (1997).

Accordingly, whether a state law violates the dormant commerce clause turns on whether the state law purposefully discriminates against out-of-state entities. Thus, the Supreme Court has found violations where states required out-of-state companies to (1) sell their products at a price that is no less than their in-state competitors, *see generally Baldwin v. G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), or (2) affirm that their in-state prices were no higher than their out-of-state or neighboring state prices, *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U. S. 573 (1986); *Healy v. Beer Institute*, 491 U. S. 324 (1989). In all three cases, the discrimination was clear – the challenged state laws punished out-of-state companies to the benefit of in-state companies by removing any competitive advantages that the out-of-state companies may have enjoyed. *Dean Milk Co. v. Madison*, 340 U. S. 349, 354 (1951) (discussing *Baldwin*); *Brown-Forman* at 580; *Healy* at 340-341.

And the same was true in *Loki*, which is Plaintiffs' seminal case. In *Loki*, New Jersey, like numerous other states, wanted to regulate intoxicating hemp products and passed various laws doing so. 2024 U.S. Dist. LEXIS 185237 at *7-16. One of the laws decriminalized any intoxicating hemp product that was cultivated, derived, or manufactured in New Jersey and sold in New Jersey, whereas intoxicating hemp products that were cultivated, derived, or manufactured outside of New Jersey was criminalized. *See id.* at *11. In other words, the definition discriminated based on location, i.e., out-of-state or in-state, versus a neutral criteria, e.g., total concentration of THC. Thus, the district court found that the challenged laws violated the dormant Commerce Clause and granted the injunction because they were discriminatory on their face – they criminalized out-of-state intoxicating hemp products while in-state products were legal. *Id.* at *28-31.

S.B. 56, including its change to the state definition of hemp and marihuana, does not offend

14

the dormant Commerce Clause because it is facially neutral – whether something is defined as "hemp" or "marihuana" turns on the total THC content, not where it was produced, sourced, or sold. *Compare* S.B. 56 *with Loki*, 2024 U.S. Dist. LEXIS 185237 at *28-31. In other words, all persons and/or entities are treated the same, regardless if they are in-state or out-of-state. At its core, S.B. 56 subjects intoxicating hemp products, which are now defined as marihuana under Ohio law, to the same regulations as marihuana. In other words, the out-of-state versus in-state distinction that was present in *Loki*, *Baldwin*, *Brown-Forman*, and *Healy* is not present in Ohio. Rather, S.B. 56's regulatory scheme modeled other states' schemes that do not offend the dormant commerce clause. *See, e.g.*, *N. Va. Hemp*, 125 F.4th at 496 ("Any limitation on buying hemp products that complies with federal law but not S.B. 903's total THC standard applies to in-state purchasers and out-of-state purchasers alike. Out-of-state processors and retailers are placed in the same position as their Virginia counterparts."). The lack of purposeful discrimination closes the book on Plaintiffs' claim.

Plaintiffs' dormant Commerce Clause claim is further hampered by their admission that the in-state Plaintiffs, e.g., Saucy Seltzer, are subject to the same alleged dormant Commerce Clause harms as the out-of-state Plaintiffs, e.g., Modern Distribution. *See* Compl., ECF No. 1, PageID # 20-21, ¶ 13. Because both in-state and out-of-state Plaintiffs are treated the exact same under S.B. 56, the dormant Commerce Clause is not triggered.

Even if this Court applies the *Pike* test, S.B. 56 easily passes constitutional muster. Any analysis must begin with the warning instilled by the *Nat'l Pork* Court – "In our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." 598 U.S. at 374. Thus, Plaintiffs must show that S.B. 56 has more than a practical effect on out-of-state companies, which they have not done. Again, S.B. 56 puts out-of-state companies in the same boat as in-state companies. If they want to engage in the business of marihuana, they must adhere to Ohio's regulations. In other words, they must get a license, which is also necessary for any in-state

15

person or company that wishes to sell marihuana. Plaintiffs' claim of harm to out-of-state companies is further lessened by the fact that approximately 65-70% of Ohio's dispensary licensees are out-of-state companies. In short, S.B. 56 does not violate the dormant Commerce Clause simply because it requires compliance with state regulations to participate in a regulated market. Moreover, the State has a substantial interest in protecting its citizens from unregulated intoxicating products. As it relates to children, who, prior to S.B. 56, were permitted to purchase and consume the Plaintiffs' highly intoxicating products, that interest is clear. But the same health and safety concerns apply to adults. The State has simply no way of knowing what is in an out-of-state intoxicating hemp product.

### 3.  Governor DeWine's line-item veto

Plaintiffs claim that S.B. 56 was never validly enacted under Article II, § 16 because Governor DeWine line-item vetoed substantive provisions of the bill. Compl., ECF No. 1, PageID #39, ¶ 105. Plaintiffs claim that the Governor's line-item veto power applies only to items of appropriation, not substantive provisions within an appropriations bill. But the Ohio Constitution's text and applicable case law show just the opposite: Governor DeWine may line-item veto any item in S.B. 56, including substantive, non-appropriations items.

Article II, § 16 of the Ohio Constitution provides, in pertinent part: "The governor may disapprove *any item or items in any bill making an appropriation of money* and the item or items, so disapproved, shall be void, unless repassed in the manner prescribed by this section for the repassage of a bill." (Emphasis added.) This section has two key parts: (1) it gives the Governor the power and authority to veto any item, so long as (2) that item is in any bill making an appropriation of money. The second part requires little analysis. The Governor's line-item veto power activates whenever a bill "contain[s], somewhere within its four corners, a specific appropriation of money." (Citation omitted.) *State ex rel. Akron Educ. Ass'n v. Essex*, 47 Ohio St.2d 47, 50 (1976).

That leaves the first part: what is an "item" under Article II, § 16? The term "item" as used in

16

Section 16 means "those provisions in an appropriation bill which are separate and distinct from other provisions in the same bill, insofar as the subject, purpose, or amount of the appropriation is concerned." *State ex rel. Brown v. Ferguson*, 32 Ohio St.2d 245, 252 (1972). An item "need not necessarily be a complete paragraph or even a complete sentence." *Elmhurst Convalescent Center, Inc. v. Bates*, 46 Ohio App.2d 206, 213 (1975) (Whiteside, J., concurring). "Under proper circumstances, a single clause, a single phrase, or even a single word may constitute an 'item' subject to the item veto." *Id.* The item need not itself be an appropriation. That much is clear from the Constitution's text: any item in a bill making an appropriation may be vetoed. Ohio Const. art. II, § 16. *See Elmhurst*, 46 Ohio App.2d at 213 (Whiteside, J., concurring) ("[W]here the General Assembly elects to include substantive provisions in a bill making an appropriation of money, the Governor's veto power extends to the items of the substantive provisions as well as to the items making appropriations.").

The Supreme Court of Ohio recently had the opportunity to weigh-in on the correct interpretation of Article II, § 16, and it did not adopt Plaintiffs' view. *Fifty West*, 2026-Ohio-972. A group of manufacturers and retailers challenged the Governor's line-item veto of S.B. 56. They argued, as Plaintiffs do here, that Governor DeWine unlawfully vetoed substantive, non-appropriations provisions in S.B. 56 and asked the Court for a writ of mandamus ordering Secretary of State Frank LaRose to file the pre-veto version of S.B. 56 as the law of Ohio. Am. Compl. at ¶ 77, *Fifty West*, S.Ct. Ohio No. 2026-0264 (Mar. 9, 2026). Although it issued no written opinion containing its reasoning, the Court—over one dissenting vote—denied a peremptory writ and granted the State's motion to dismiss. *Fifty West*, 2026-Ohio-972, ¶ 1.

This Court should take its cue from the dismissal in *Fifty West* and find that Governor DeWine lawfully exercised his line-item veto power. First, the Supreme Court of Ohio is the ultimate authority on the interpretation of Ohio law and whether a law violates Ohio's Constitution. *See, e.g., Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008) ("No federal court has the final say on what Ohio

17

law means. Even a decision by the highest federal court, the United States Supreme Court, about the meaning of an Ohio law has no more binding authority on the Ohio Supreme Court than a decision of the Michigan Supreme Court or for that matter any other court."). Similar plaintiffs in *Fifty West*, which included Plaintiff Grayscale, presented this exact line-item veto claim to the Supreme Court of Ohio, which rejected it. That should end the issue for good. But even if this Court considers Plaintiffs' claim, it fails. Tellingly, Plaintiffs simply conclude that the Governor had no power to veto non-appropriations provisions without any support. Compl., ECF No. 1, PageID # 39 at ¶ 110. But the text of the Ohio Constitution plainly says otherwise, as does the caselaw. Thus, Plaintiffs are not likely to succeed on their claim that the Governor exceeded the permissible scope of his veto power.

**E. Plaintiffs' long delay in seeking relief undercuts their claims of irreparable harm.**

Any claim of irreparable harm rings hollow in light of Plaintiffs' delay in seeking relief. In the three months between S.B. 56's passage and its effective date, Plaintiffs apparently sat idle. They neither prepared for the law's implementation nor challenged it. Nor did they do anything in the nearly three months between S.B. 56's effective date and the date they filed their lawsuit. Instead, they waited until after S.B. 56 became effective and now urge the Court to find irreparable harm due to the imminent destruction of their businesses. But their delay in seeking emergency relief severely undercuts their claims of irreparable harm. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 405 (6th Cir. 2013) ("[A]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm."). Further, the federal definition of "hemp" *will* change on November 12, per the 2025 Reconciliation Bill. Thus, even the federal clock is nearly done ticking.

**F. The remaining equitable factors weigh against a temporary restraining order.**

An injunction of S.B. 56 would harm Ohio consumers and the general public. The equitable factors therefore strongly weigh against a preliminary injunction. Plaintiffs overlook the harm-to-others factor, but it alone justifies the denial of a preliminary injunction here. *Corral v. Cuyahoga Cty.*,

18

2024 U.S. Dist. LEXIS 167867, at *6 (N.D. Ohio Sept. 17, 2024) ("[Emergency relief] should not be granted if substantial harm will be caused to others."). Enjoining S.B. 56 would harm the State, licensees of the marihuana program (certain licensee employees would lose their jobs as they would be disqualified under the pre-S.B. 56 provisions), and local governments (which have received tax dollars which would otherwise have to be returned if S.B. 56 is enjoined). Additionally, putting S.B. 56 on hold would injure Ohio consumers and the general public. Before S.B. 56, hemp processors began chemically altering their products to mimic the psychoactive properties of marihuana while avoiding marihuana regulations. Ohio's strict growing, manufacturing, testing, and retail regime for marihuana products keeps Ohioans safe. Hemp, on the other hand, went entirely unregulated before S.B. 56, exposing Ohioans to pesticides, contaminants, and unknown substances.

Of course, the public interest does not favor enjoining statutes that prevent harm to Ohio consumers. But the public interest favors denying the injunction for another reason. Giving effect to the laws enacted by the people's representatives always advances the public interest. Conversely, the public and the State always suffer when a State is prevented from enforcing its own laws. *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

### G. Plaintiffs' requested relief violates *Trump v. CASA*.

Plaintiffs improperly seek complete relief at this "emergency" stage of their complaint, which effectively serves as a "universal injunction" prohibiting the application of S.B. 56 across all of Ohio. *See* Compl., ECF No. 1, PageID # 45 (seeking a state-wide injunction against a class of all of Ohio's law enforcement officers from taking, among other actions, "any * * * official action—whether civil, regulatory, administrative, or criminal—based upon the S.B. 56 version of R.C. 928.01(C)."). Such relief would be inappropriate under the Supreme Court's decision in *Trump v. CASA, Inc.*, 608 U.S. 831 (2025). In *Trump*, the Court held that a "universal injunction"—an injunction "prohibit[ing]

19

enforcement of a law or policy against anyone," *id.* at 837—"falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 847. "When a federal court enters a universal injunction against the Government, it 'improper[ly] intru[des]' on 'a coordinate branch of the Government' and prevents the Government from enforcing its policies against nonparties." *Id.* at 859 (citation omitted). Accordingly, injunctions issued by federal courts should not be "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

*CASA* concerned a universal injunction prohibiting the federal government from enforcing an executive order against anyone. But its principles apply to injunctions against the state as well. In *CASA*, the Court reasoned that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." 606 U.S. at 860-61 (citing *Maryland v. King*, 567 U. S. 1301, 1303 (2012) (Roberts, C. J., in chambers)). While the Sixth Circuit has "yet to decide . . . how *CASA* applies in the context of a state-law challenge," *Doe v. Burlew*, 165 F.4th 525, 530 (6th Cir. 2026), at least one other circuit has instructed lower courts to consider its application in suits against state officials seeking to enjoin state laws. *See, e.g.*, *Iowa Migrant Movement for Justice v. Bird*, 157 F.4th 904 (8th Cir. 2025) (instructing court to determine whether a narrower injunction is required under *CASA*). Here, the purpose of a temporary restraining order (as well as a preliminary injunction) is to maintain the status quo. Accordingly, to comply with *CASA*, any TRO must be limited to allowing the status quo to remain. But the status quo in Ohio, since March 20, is that Plaintiffs are prohibited from operating their businesses as they lack the proper licensure to do so. Thus, any version of Plaintiffs' requested TRO would violate *CASA* and should be denied.

## II.   CONCLUSION

For the foregoing reasons, the State respectfully asks this Court to deny Plaintiffs' motion for temporary restraining order and injunction.

20

Respectfully submitted,

D. ANDREW WILSON
Ohio Attorney General

/s/ *Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069762)*
**Lead Counsel*
MICHAEL A. WALTON (0092201)
ANN YACKSHAW (0090623)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215-3428
Tel: 614-466-1853 | Fax: 855-326-1696
Julie.Pfeiffer@OhioAGO.gov
Michael.Walton@OhioAGO.gov
Ann.Yackshaw@OhioAGO.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF SERVICE

I certify that on June 11, 2026, the foregoing was filed via the Court's electronic filing system. Notice of this filing was sent via the Court's electronic filing system to all counsel who have entered appearances.

/s/ *Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069762)
Assistant Attorney General

21